# UNITED STATES DISTRICT COURT

### for the

### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>500 Jackson Street, Kannapolis, NC, and electronic<br>devices owned, used, or controlled by Brett Rotella a/k/a<br>Brett Ostrander at the premises | )<br>)<br>)<br>)<br>)<br>) Case No. 1:23MJ 362 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(c)(2); § 111;<br>§ 371; § 372; § 1361; § 2101;<br>§ 231; 40 U.S.C. § 5104(e)(2) | Obstruction of Congress; Assault, resist, or impede certain officers; conspiracy;<br>conspiracy to impede or injure officers; destruction of government property;<br>interstate travel to participate in a riot; civil disorder; unlawful activities on Capitol |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/S/ Barton Jenkins
*Applicant's signature*

_____
Barton Jenkins, Special Agent, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 08/25/23

_____
*Judge's signature*

City and state: _____ Greensboro, North Carolina _____

_____
L. Patrick Auld, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched.*

The property to be searched is 500 Jackson Street, Kannapolis, North Carolina (the "PREMISES"), further described as a single story, stand-alone house with red brick exterior and white shutters.



1

**ATTACHMENT B**

*Property to be seized.*

The items to be seized are evidence, information, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 1512(c)(2) (obstruction of Congress); 111 (assaulting, resisting, or impeding certain officers); 231 (civil disorder), 371 (conspiracy); 372 (conspiracy to impede or injure officer); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(a) (various offenses in restricted buildings or grounds); and 40 U.S.C. §§ 5104(e)(2) (various offenses in the Capitol Buildings) (the "TARGET OFFENSES") that have been committed by BRETT ROTELLA a/k/a Brett Alan Ostrander ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; in the form of:

### Clothing and Other Objects

1.     Evidence of the TARGET OFFENSES such as articles of clothing worn by ROTELLA or objects possessed or used by ROTELLA at the Capitol Buildings on January 6, 2021 to include a black sleeveless puffy vest, a red sleeveless t-shirt, a red skull cap, white or gray Nike shorts with a Nike swoosh on them, and black tennis shoes; and flags or a flag pole, canisters of pepper spray or other non-lethal crowd control remnants, consistent with those objects held or used by ROTELLA on January 6, 2021; and other clothing, articles, or objects that constitute evidence that ROTELLA participated in the unlawful activity at the U.S. Capitol;

### Physical documents, records, photographs, papers and objects

2.     Physical documents, records, photographs, papers, and objects that constitute evidence of the TARGET OFFENSES, as follows:

      a.   documents, records, photographs, and objects that show ROTELLA and other persons engaged in any conspiracy, planning, or preparation to commit those offenses;

      b.   documents, records, photographs, and objects that show ROTELLA made efforts after the fact to conceal evidence of his participation in those offenses, or to flee prosecution for the same;

1

c. documents, records, photographs, and objects that reveal the identity of persons who collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation;

d. documents, records, photographs, and objects that show ROTELLA engaged in planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

e. documents, records, photographs, and objects that show ROTELLA unlawfully entered into the U.S. Capitol, including any property of the U.S. Capitol;

f. documents, records, photographs, and objects that show ROTELLA researched or had knowledge of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

g. documents, records, photographs, and objects that show ROTELLA was making efforts, or aware of other's efforts to obstruct, impede, or disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

h. documents, records, photographs, and objects that show ROTELLA participated in the breach and unlawful entry of the United States Capitol on January 6, 2021;

i. documents, records, photographs, and objects that show ROTELLA participated in the riot and/or civil disorder at the United States Capitol on January 6, 2021;

j. documents, records, photographs, and objects that show ROTELLA participated in the assaults of federal officers/agents and took actions to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

k. documents, records, photographs, and objects that show ROTELLA committed damage to, or theft of, property at the United States Capitol on January 6, 2021;

l. documents, records, photographs, and objects that show ROTELLA was aware prior to January 6, 2021, that the U.S. Capitol was closed to the public on January 6, 2021;

m. documents, records, photographs, and objects that show ROTELLA was present at the U.S. Capitol on or around January 6, 2021;

n. documents, records, photographs, and objects that show ROTELLA was researching the results of, challenges to, or questions about the legitimacy of the 2020 Presidential Election;

2

o. documents, records, photographs, and objects, such as receipts for travel, which may serve to prove ROTELLA traveled to or from Washington, D.C. from November, 2020 through January, 2021, his motive and intent for making such travel to Washington, D.C. and the U.S. Capitol on or about January 6, 2021, and the planning of his travel to and activities in Washington, D.C. on or about January 6, 2021, including coordinating travel with or planning to meet with other persons, and his research about the U.S. Capitol, modes of travel, travel expenses, and travel logistics on or about January 6, 2021;

p. documents, records, photographs, and objects that show ROTELLA knew about plans to riot or intended to riot at the U.S. Capitol on January 6, 2021, participated in the riot at the U.S. Capitol on January 6, 2021, or followed news accounts of the investigation of the riot at the U.S. Capitol on January 6, 2021 in its aftermath;

q. documents, records, photographs, and objects containing names, addresses, and telephone numbers of conspirators and potential witnesses of violations of the TARGET OFFENSES when this association is evident from the document, record, photograph, or object itself; and

r. Photographs of ROTELLA and/or co-conspirators at events in Washington D.C. on January 6, 2021, and photographs of events in Washington D.C. on or about January 6, 2021, which constitute evidence of the TARGET OFFENSES by revealing relationships between members of a conspiracy, and documenting places visited by ROTELLA while in Washington D.C.

**Electronic Devices (Cell Phones, Laptops, and Tablets) and Electronic Evidence**

3. The seizure of electronic devices (hereinafter "the Devices(s)"), belonging to ROTELLA and located at the PREMISES at the time of the execution of this warrant, specifically:

a. cellular phones bearing phone numbers XXX-XXX-8126 ("Rotella Phone 1") and/or XXX-XXX-7719 ("Rotella Phone 2");

b. any additional cellular phone that can be easily identified as being owned or possessed by ROTELLA; and

c. any laptop computer or tablet computer that can be easily identified as being owned or possessed by ROTELLA.

3

4. The search of each of the Device(s) for the following electronic evidence:

a. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA and other persons engaged in any conspiracy, planning, or preparation to commit those offenses;

b. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA made efforts after the fact to conceal evidence of his participation in those offenses, or to flee prosecution for the same;

c. electronic documents, records, data, videos, photographs, and electronic communications that reveal the identity of persons who collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation;

d. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA engaged in planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

e. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA unlawfully entered into the U.S. Capitol, including any property of the U.S. Capitol;

f. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA researched or had knowledge of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

g. documents, records, photographs, and objects that show ROTELLA was making efforts, or aware of other's efforts to obstruct, impede, or disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

h. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA participated in the breach and unlawful entry of the United States Capitol on January 6, 2021;

i. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA participated in the riot and/or civil disorder at the United States Capitol on January 6, 2021;

j. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA participated in the assaults of federal officers/agents and took actions to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

4

k. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA committed damage to, or theft of, property at the United States Capitol on January 6, 2021;

l. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA was aware prior to January 6, 2021, that the U.S. Capitol was closed to the public on January 6, 2021;

m. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA was present at the U.S. Capitol on or around January 6, 2021;

n. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA was researching the results of, challenges to, or questions about the legitimacy of the 2020 Presidential Election;

o. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA made travel arrangements to travel to Washington, D.C. in or around January 2021, his motive and intent for travel to Washington, D.C. in or around January 2021, the planning of his travel to and activity in Washington, D.C. on or about January 6, 2021, including coordinating travel with or planning to meet with other persons, his research about the U.S. Capitol, and mode of travel, travel expenses, and travel logistics on or about January 6, 2021;

p. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA knew about plans to riot or intended to riot at the U.S. Capitol on January 6, 2021, participated in the riot at the U.S. Capitol on January 6, 2021, or followed news accounts of the investigation of the riot at the U.S. Capitol on January 6, 2021 in its aftermath;

q. electronic documents, records, data, photographs, and electronic communications that contain names, addresses, and telephone numbers of conspirators and potential witnesses of violations of the TARGET OFFENSES when this association is evident from the document, record, photograph, or object itself; and

r. electronic documents, records, data, videos, photographs, and electronic communications that show ROTELLA and/or co-conspirators were at events in Washington D.C. on January 6, 2021, and videos or photographs of events in Washington D.C. on or about January 6, 2021, which constitute evidence of the TARGET OFFENSES by revealing relationships between members of a conspiracy, and documenting places visited by ROTELLA while in Washington D.C.;

5

5.   The search of each of the Device(s) for:

a.   evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.   evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.   evidence of the times the Device(s) was used in connection with items that are otherwise subject to seizure under this warrant;

f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.   records of or information about Internet Protocol addresses used by the Device(s); and

i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that pertain to the events of January 6, 2021 at the U.S. Capitol; attempts to obstruct, impede, or disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election; the U.S. Capitol grounds and features of the U.S. Capitol building; the Federal Bureau of Investigation's investigation of the events of January 6, 2021 at the U.S. Capitol; ROTELLA's own participation or the participation of others in the events of January 6, 2021 at the U.S. Capitol, such as rioting, assaulting or impeding police officers, and transgressing police barriers and

6

U.S. Capitol access points; and pertaining to item otherwise subject to seizure under this warrant.

**Use of Biometric Information to Access the Devices(s)**

6.      Law enforcement personnel are also specifically authorized to obtain from ROTELLA, a/k/a Ostrander the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) identified in Attachment B, Paragraph 3, above, if the Device(s) were seized at the PREMISES pursuant to this warrant and the Device(s) require such biometric access, for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

(a)      any of the Device(s) found at the PREMISES and listed in Attachment B, Paragraph 3, above,

(b)      where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant. Law enforcement officers are not authorized by this warrant to utilize biometric characteristics from any other individuals present at the PREMISES at the time of execution of the warrant to gain access to any electronic devices.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the

7

aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems,

8

routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

## Safes and Secured Containers

7.     The seizure and search of safes, both combination and key type, or secured storage containers that could hold documents, devices, and objects such as those described above in this Attachment, and entry into those safes and secured storage containers by force, is authorized by this warrant if such entry cannot easily be achieve by other means, and seizure of the contents, which contain evidence of the commission of the TARGET OFFENSES in the forms identified above; and

## Indicia of Ownership and Control

8.     Indicia of ownership and control, including, receipts, invoices, bills, canceled envelopes, and keys, which identifies ROTELLA as the owner of documents, devices, objects, and other evidence of the TARGET OFFENSES.

9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 500 JACKSON STREET, KANNAPOLIS, NC, AND ELECTRONIC DEVICES OWNED, USED, OR CONTROLLED BY BRETT ROTELLA, A/K/A BRETT OSTRANDER AT THE PREMISES | Case No. 1:23MJ _362_ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Barton Jenkins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises at 500 Jackson Street, Kannapolis, North Carolina, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.      I am a Special Agent with the Federal Bureau of Investigation. I have been in this position since 2002. I am currently assigned to the Charlotte, North Carolina Division, Joint Terrorism Task Force. My official duties include the investigation of domestic and international terrorist organizations. I have attended New Agents Training at the FBI Academy in Quantico, Virginia, which encompasses detailed training in conducting terrorism investigations. Over the past three (3) years I have conducted or assisted in the investigation of domestic terrorists. I have prepared and assisted in the preparation of court orders and search warrant applications. Additionally, during the course of these and other investigations, I conducted or participated in physical and electronic surveillance, assisted in the execution of search and arrest warrants, debriefed informants, interviewed witnesses and suspects, and reviewed other pertinent records. I am currently tasked with investigating criminal activity that occurred in and around the Capitol grounds on January 6, 2021.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

2

6. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1512(c)(2) (obstruction of Congress); 111 (assaulting, resisting, or impeding certain officers); 231 (civil disorder), 371 (conspiracy); 372 (conspiracy to impede or injure officer); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(a) (various offenses in restricted buildings or grounds); and 40 U.S.C. §§ 5104(e)(2) (various offenses in the Capitol Buildings) (the "TARGET OFFENSES") have been committed by BRETT ROTELLA, also known as Brett Ostrander ("the Subject"), and other identified and unidentified persons, including others who may have been aided and abetted by, or conspired with the Subject. There is also probable cause to search the PREMISES further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

7. U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

8. At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the

3

Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

9.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.    On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.    On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.    As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the

4

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

15.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

16.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

5

17.     Beginning shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



18.     Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun

6

police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine.

19. Between approximately 2:10 p.m, EST and 2:30 p.m. EST, Vice President Pence evacuated the Senate Chamber, and the Senate and House of Representatives were locked down and went into recess. Both the Senate and the House of Representatives Chamber were evacuated.

20. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside. At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21. At around 2:47 p.m. EST, subjects broke into the Senate Chamber not long after it had been evacuated. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



A Reporter's Footage from Inside the Capitol Siege

Where are they?

THE NEW YORKER

4 07/12:32

22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.

8



23.     One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated at least in part, "Only A Matter of Time Justice is Coming!"



A Reporter's Footage from Inside the Capitol Siege

[group murmuring]

7:47/12:32

24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.

10





11

25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

12

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

13



---

1     https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

14



---

2  https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

15



3

### *Facts Specific to This Application*

37.     Based upon review of public video, closed circuit television ("CCTV") footage and police body worn camera ("BWC") footage depicting the events at the U.S. Capitol building and grounds on January 6, 2021, law enforcement identified an individual who confronted police officers, led other rioters in advancing toward retreating police, grabbed police riot shields and repeatedly pushed against police in an effort to gain entrance to the U.S. Capitol. The FBI subsequently posted a photograph of the individual at the U.S. Capitol under the name 82-AFO and requested help from the public to identify the individual. As set out in detail below, law enforcement has identified 82-AFO as BRETT ROTELLA ("ROTELLA"), also known as Brett

---

3     https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

Alan Ostrander. As set out below, law enforcement has identified the PREMISES as ROTELLA's residence and there is probable cause to believe that there is evidence, information and instrumentalities of the TARGET OFFENSES at the PREMISES.

### A. ROTELLA'S Activities at the U.S. Capitol on January 6, 2021

38.     According to BWC footage, ROTELLA was located on the West Plaza of the U.S. Capitol building on January 6, 2021 at approximately 2:24 p.m. Below is a still image from BWC depicting ROTELLA (circled in red) on the West Plaza:



39.     As depicted above, ROTELLA was wearing a red skull cap, a black sleeveless puffy vest over a red sleeveless shirt, white or gray long shorts with a black stripe and black tennis shoes.

17

ROTELLA also held a long pole with at least two flags affixed to it at various points during the day.

40.    Approximately 2 minutes later, ROTELLA approached a metal police barricade, grabbed the barricade and pushed it in the direction a Metropolitan Police Department ("MPD") officer, Officer D.T., and yelled "fuckin' tear gas us, I didn't do shit!" ROTELLA also yelled, "we just want things to be right" and "something has to happen or we're all fucked!" Below is a still image from Officer D.T.'s BWC depicting ROTELLA immediately after he pushed the barricade towards Officer D.T.:



41.    At approximately 2:33 p.m., the police line on the West Plaza fell and numerous police officers retreated away from the area. As the police near him retreated, ROTELLA led numerous other rioters in quickly following the police up the southwest stairs from the West Plaza.

18

As ROTELLA led the group up the stairs, he periodically paused calling out "HOLD!" or holding up his fist to indicate to the group behind him to stop. Below is another still image from BWC showing ROTELLA directing other rioters to stay in place while the police retreat:



42.     Below is another still image from BWC depicting ROTELLA holding his right arm up in a fist to indicate to the rioters behind him to stop while the police retreat:

Case 1:23-mj-00362-LPA   Document 1   Filed 08/25/23   Page 30 of 82



43.     After reaching the top of the stairs, ROTELLA led the rioters in turning left at the

top of the stairs and around the corner where he again confronted police officers attempting to stop

the crowd from breaching the building. Below is a still image of ROTELLA from BWC still at the

front of a large crowd of rioters, again holding up his right hand in a fist to indicate to his followers

that they should hold their place:

20



44.     As the officers dispersed from the area, ROTELLA led the crowd of rioters toward

the Inaugural Stage. Below is a still image from BWC depicting ROTELLA leading a crowd of

rioters toward the U.S. Capitol building:



45.     At approximately 2:40 p.m., ROTELLA followed the police into a long hallway leading into the U.S. Capitol building on the Lower West Terrace referred to as "the tunnel." As ROTELLA followed the police, a police officer fired rubber bullets at the ground near his feet in an attempt to stop his advance. ROTELLA then turned around and began to walk backward toward the police as the rubber bullets were fired at the ground near his feet. Below is a still image from CCTV depicting the police firing rubber bullets at ROTELLA as he continues to advance by walking backward into the tunnel:

22



46.     The police then retreated into the tunnel. They shut and locked the first of two sets of double doors to the entrance of the U.S. Capitol building. ROTELLA stood outside those doors and stared in at the police line. Below is a still image from BWC depicting ROTELLA staring in at the police. He also appears to still be holding the flag pole in his left hand:

Case 1:23-mj-00362-LPA   Document 1   Filed 08/25/23   Page 34 of 82



47.     Moments later, the rioters smashed one of the panes of glass in the doors and opened

the set of doors. They then approached the police line, which was established behind the second

set of doors. As depicted in the still image from BWC below, ROTELLA reached around and

opened the door on the left and then was the second rioter to enter the tunnel:

24



48.     Another rioter came through the doors and quickly began to physically fight the police. Soon, other rioters, including ROTELLA joined. For example, below is a still image from CCTV depicting ROTELLA (circled in red and recognizable by his orange/red skull cap, sleeveless shirt and black vest), with his right arm outstretched and pushing against the police shields:

Case 1:23-mj-00362-LPA   Document 1   Filed 08/25/23   Page 36 of 82



49.     At approximately 2:43 p.m., ROTELLA turned his back on the police line and pushed against the police officers while using his hand to help leverage his weight and push against the door frame. Below is a still image from BWC depicting ROTELLA pushing against the door frame to help him push harder against the police. The officers asked ROTELLA to let go of the door but he said, "I don't want her to get hurt." It appeared that at this time, ROTELLA may have been creating space for a smaller female near him:

26



50.     Below is a still image from another video obtained during the investigation ("Video

1") depicting ROTELLA pushing against the police from the angle of the mob.



51.     Video 1 also indicates ROTELLA may have been at least partially protecting a small female near him for part of the time he was at the police line. However, the female moves away from the front line approximately two minutes into the video, but ROTELLA remained at the police line. Video 1 shows that as he pushed, ROTELLA also briefly grabbed the edge of a police riot shield before releasing it and raising his hand in the air. Near the end of Video 1, ROTELLA stated, "Just go back please."



52.     After several minutes at the front of the police line, ROTELLA appeared to be sprayed with OC spray. Clamping his eyes shut, he felt his way out of the tunnel. Another public video ("Video 2") depicts ROTELLA as he left the front of the police line:

28



53.    According to CCTV footage, 82-AFO left the tunnel at approximately 2:55 p.m.



29

54.     Approximately one hour later, ROTELLA was still located at the area near the tunnel. By this time, the police had successfully expelled the rioters from inside the tunnel, but the mob was continuing to fight against the police from outside. ROTELLA was a member of a large crowd that was pushing in concerted fashion and calling out "heave ho" from outside the tunnel against the police line. Below is a still image of ROTELLA from a video obtained during the investigation ("Video 3") depicting ROTELLA pushing along with the rest of the mob against the police at approximately 3:50 p.m.[4]



55.     Approximately four minutes later, while still pushing with other members of the mob, ROTELLA extended his left hand in the air, extended his left index finger, then his middle

_____

[4] Video 3 does not have time stamps. The estimated time is based on a comparison between Video 3 and other videos that do include timestamps, like CCTV and BWC.

30

finger, then his ring finger as if to count "1, 2, 3" and then pushed hard against the rioters in front of him. Below is a still image from Video 3 depicting ROTELLA counting the crowd down to direct a group push against the police.



56.     Another public video ("Video 4") shows ROTELLA (in the yellow square) counting the crowd down from an angle directly behind him:



57.     ROTELLA then made his way through the dense crowd closer to the police line. Once he was at the police line, another rioter handed ROTELLA a pink tube-like object, possibly pepper spray. It appears that ROTELLA attempted to activate the pepper spray – perhaps as a test – but it did not spray. ROTELLA later dropped the item when a ladder was passed overhead. Below is a still image from another public video ("Video 5") depicting ROTELLA with the pink item in his right hand:

32



58.     Moments later, ROTELLA no longer had the pink item in his hand when he was

passed a large orange ladder. ROTELLA grabbed the ladder and pushed it overhead toward the

police line and into the mouth of the tunnel. Below is a still image from Video 5 depicting

ROTELLA (circled in red) grabbing the ladder and handing it behind him:

33



59.    Below is a still image from CCTV depicting ROTELLA's arm (circled in red) as

the ladder was being pushed in the tunnel at the police:

34



60. ROTELLA pushed the entire length of the ladder back and into the tunnel. Below

is a still image of ROTELLA (circled in red) from another video obtained during the investigation

("Video 6") grabbing the end of the ladder and continuing to push it into the tunnel at the police:

35



61.     After the ladder was pushed back out of the tunnel by the police, ROTELLA

continued to push against other rioters near him in an effort to collectively push against and breach

the police line in the tunnel. Below is a still image from Video 5 depicting ROTELLA (circled in

red) pushing with his back to the tunnel as the ladder is being pushed back out into the crowd by

the police:

36



**B. Identification of 82-AFO as BRETT ROTELLA and identification of the PREMISES as ROTELLA's Residence.**

62.     FBI posted a photograph of 82-AFO to its website and asked members of the public for help in identifying him. Below is the photograph posted by the FBI of 82-AFO:



63.     Law enforcement became aware that 82-AFO may be BRETT ROTELLA.[5] Based

on a search of law enforcement and open-source databases, FBI identified a potential residence for

ROTELLA in Kannapolis, North Carolina (the PREMISES). On or about July 27, 2023, FBI

performed surveillance at the PREMISES. At approximately 4:15 p.m. that afternoon, a white male

matching the description 82-AFO exited the residence with a woman and two minor children. The

---

[5] FBI received at least three [3] tips from the public that identified 82-AFO as someone other than
BRETT ROTELLA. FBI was able to rule out these other tips by, among other things, conducting
open-source research, reviewing law enforcement databases and conducting interviews.

man, woman and children then got into a vehicle and left the Rotella Residence. FBI maintained physical surveillance of the vehicle and the occupants after it departed the Rotella Residence, including when the vehicle stopped at a nearby Aldi store and the occupants went inside. Below is a photograph of the white male who exited the Rotella Residence inside the Aldi store (minor children have been redacted):



39

64. At approximately 6:09 p.m., the vehicle and its occupants returned to the Rotella Residence, and the man, woman, and children exited the vehicle and entered the residence.

65. Based on FBI's observations of the white male – including the above photograph - and a comparison with known photographs of BRETT ROTELLA, agents believe the white male to be ROTELLA. Further, based on a comparison between ROTELLA and images of 82-AFO from January 6, 2021, agents believe ROTELLA to be 82-AFO.

66. For example, I compared a number of tattoos that appear on 82-AFO's arms with tattoos that appeared on ROTELLA's arms during physical surveillance. Below are photographs of 82-AFO on January 6, 2021 and ROTELLA at the Aldi store during surveillance in July 2023 with a number of tattoos identified. I believe that each numbered tattoo (e.g. Tattoo 1, Tattoo 2, etc) is identical on both 82-AFO and ROTELLA. Based on this comparison, I believe 82-AFO is ROTELLA.

**Aldi Store - July 27, 2023**          **U.S. Capitol Grounds – January 6, 2021**



Tattoo 1                                          Tattoo 1

40



Aldi Store - July 27, 2023

Tattoo 4

Tattoo 2

Tattoo 1

Tattoo 3



Tattoo 2

Tattoo 5

Tattoo 1

Tattoo 3

U.S. Capitol Grounds – January 6, 2021

41



**U.S. Capitol Grounds – January 6, 2021**



67.     FBI also performed open-source research and identified two potential phone numbers associated with ROTELLA: phone numbers (XXX) XXX-8126 ("Rotella Phone 1") and (XXX) XXX-7719 ("Rotella Phone 2"). According to information obtained from Verizon Wireless pursuant to a search warrant, Rotella Phone 1 and Rotella Phone 2 were identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the United States Capitol building on January 6, 2021. Specifically, Verizon records indicated that Rotella Phone 1 was present at or near the U.S. Capitol at least as early as approximately 2:41 p.m. ET until approximately 4:10 p.m. ET. Verizon records also indicated Rotella Phone 2 was present at or near the U.S. Capitol at least as early as approximately 2:41 p.m. ET until 3:43 p.m. ET.

68.     Furthermore, according to a search of law enforcement databases, it appears that ROTELLA may have changed his name in or around 2020 to Brett Alan Ostrander. Specifically,

42

FBI located a North Carolina driver's license that was issued in September 2020 to a Brett Alan Ostrander. The driver's license appears to depict ROTELLA and lists the Rotella Residence as his address.

69.     Finally, on August 5, 2023, the Mooresville, North Carolina Police Department responded to a call for service at an address in Mooresville, North Carolina. During that response, they interacted with a man who identified himself as Brett Ostrander. During their investigation, Ostrander provided Rotella Phone 1 as his current phone number. On or about August 23, 2023, I spoke with one of the officers from the Mooresville Police Department who responded to the August 5, 2023, call and showed him photographs of 82-AFO from the U.S. Capitol on January 6, 2021. The officer identified 82-AFO as Brett Ostrander, the person that he encountered on August 5, 2023.

70.     I know, based on my training and experience, that people routinely re-wear clothing and accessories, store these items in their homes, and keep them for an extended period. Clothing and accessories consistent with those worn by ROTELLA on January 6, 2021 constitute evidence of the commission of the offenses discussed herein, in that ROTELLA can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire and accessories worn that day.

71.     I also know, based on my training and experience, that cell phones are expensive, and people routinely retain their cell phones for many months or years.

72.     Your affiant also knows that hundreds of people have been arrested in connection to the riot that occurred at the U.S. Capitol on January 6, 2021. During searches of many those

43

people's homes, from early 2021 through present, in multiple jurisdictions, law enforcement has recovered clothing, paraphernalia, tools, and devices that were worn, used, or carried on January 6, 2021.

73.     For example, on June 29, 2022, the home and adjacent barn of a defendant in the District of Rhode Island was searched, and agents recovered two handheld radios consistent with the radio that the defendant was photographed holding in Washington, D.C. on January 6, 2021. On January 13, 2023, a search conducted in the Eastern District of Virginia yielded a subject's cell phone used on January 6 and several items believed to be worn on January 6—including a backpack, a neck gaiter, a tricorn hat, and body armor.  On February 1, 2023, the homes of two suspected rioters were searched in the Eastern District of Michigan.  In one home, officers located clothing worn by the individual at the Capitol on January 6.  In the other home, agents discovered both clothing as well as the stick/club this individual took into the Capitol as well as a protest sign he displayed that day.  On April 11, 2023 in the Western District of Texas, an American flag neck gaiter, black pants, and a fleece-lined leather winter hat worn by a suspected rioter on January 6 were recovered in his home. On April 12, in the District of New Mexico, officers searched the home of a suspected rioter and recovered the chrome-colored goggles he wore on January 6. On April 27, the homes of two suspected rioters were searched in the Middle District of Pennsylvania. In one home, officers recovered the blue Yamaha jacket the individual wore at the Capitol on January 6. In the other home, officers recovered a blue Trump hat the individual wore at the Capitol that day.

44

74.     In this instance, law enforcement believes that ROTELLA possessed a cellular phone at the U.S. Capitol on January 6, 2021 based on search warrant returns identifying Rotella Phone 1 as utilizing a cell site consistent with providing service to a geographic area that included the interior of the United States Capitol building on January 6, 2021. Specifically, Verizon records indicated that Rotella Phone 1 was present at or near the U.S. Capitol at least as early as approximately 2:41 p.m. ET. until approximately 4:10 p.m. ET. These time periods are consistent with the times that ROTELLA was observed on video in or near the Lower West Terrace tunnel. Therefore, there is probable cause to believe that Rotella Phone 1 will contain evidence, information or instrumentalities of the TARGET OFFENSES.

75.     Further, based on the investigation, numerous persons committing the TARGET OFFENSES possessed digital devices to communicate with other individuals to plan their attendance in Washington D.C. on January 6, 2021, to coordinate with other participants at the gatherings there that day, and to communicate and post on social media and digital forums about the events of January 6 after they occurred.

76.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

77.     In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent

45

loss. Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service. Thus, there is reason to believe that evidence of the offense that originally resided on the Subject's cell phone may also be saved to other digital devices within the PREMISES.

78.     The property to be searched includes mobile phones owned, used, or controlled by ROTELLA, including but not limited to Rotella Phone 1, hereinafter the "Devices."

## TECHNICAL TERMS

79.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical,

46

and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books";

47

sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

       d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals

48

from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service

49

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  h.  The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  i.  "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

  j.  A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

50

k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

51

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i. When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.     "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the

52

functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

      q.    "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

53

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

78.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.      Individuals who engage in criminal activity use digital devices, like the Device(s), to communicate with co-conspirators

54

online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

    b.  Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

    c.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto

the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

56

79.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

57

paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file

58

creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

        c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus

59

programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.       I know that when an individual uses a digital device to commit a crime, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

80. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of

60

digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital

61

device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

    d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable

62

document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated

63

before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be

64

anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

81.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the

65

examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to

66

whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

82.     This warrant permits law enforcement agents to obtain from the person of BRETT ROTELLA, also known as Brett Alan Ostrander (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

83.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition

67

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

84. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

85. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

86. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward

68

the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

87.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

88.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

89.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48

69

hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

90. Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the PREMISES; (2) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

91. The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to

unlock or access the Device(s). Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

92.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

/s/ **Barton Jenkins**
Barton Jenkins, Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 25th day of August, 2023, at 3:50 a.m./p.m.

L. Patrick Auld
United States Magistrate Judge

71